[L. A. No. 24146.   In Bank.   Feb. 21, 1958.]

PACIFIC PIPELINE CONSTRUCTION COMPANY (a Corporation), Respondent, v. STATE BOARD OF EQUALIZATION, Appellant.

Edmund G. Brown, Attorney General, James E. Sabine, Assistant Attorney General, Ernest P. Goodman, Dan Kaufmann and James C. Maupin, Deputy Attorneys General, for Appellant.

Thomas A. Wood and Larwill & Wolfe for Respondent.

TRAYNOR, J.—Defendant appeals from a judgment entered in favor of plaintiff in an action for a refund of certain sales taxes, interest and penalties paid under protest, after trial before the court without a jury.

Although other issues were tried in the action, the sole question presented on this appeal is whether plaintiff is required to pay a sales tax with respect to a certain transfer to Pacific Pipeline & Engineers, Ltd., by plaintiff on March 14, 1949, of machinery and equipment valued at $201,230.50.

Defendant determined that plaintiff was required to pay a tax of $6,491.78.

Prior to February 24, 1949, plaintiff and Engineers, Ltd., jointly owned Pacific Pipeline & Engineers, Ltd., which was engaged in the pipeline construction business. On February 24, 1949, an agreement was entered into by the three corporations and certain individuals providing for a reorganization of Pacific Pipeline & Engineers, Ltd., and plaintiff and for a territorial division of the pipeline business. On March 12, 1949, plaintiff entered into an agreement with Pacific Pipeline & Engineers, Ltd., providing for the exchange of certain properties to carry out the agreement of February 24th, and on March 14, 1949, the exchange occurred. The trial court determined that the sale was an occasional sale under sections 6367 and 6006.5 of the Revenue and Taxation Code.

The transfer in question was unquestionably a sale[1] at retail[2] of tangible personal property. It is conceded that the gross receipts from the sale must be included in the measure of the tax imposed by section 6051[3] of the Revenue and Taxation Code, unless the sale was an occasional sale under sections 6367[4] and 6006.5. Section 6019[5] was enacted

---

[1] " 'Sale' means and includes: (a) Any transfer of title or possession, *exchange,* barter, lease, or rental, conditional or otherwise, in any manner or any means whatsoever, of tangible personal property for a consideration. . . ." (Italics added.) (Rev. & Tax. Code, § 6006.)

[2] " 'A 'retail sale' or 'sale at retail' means a sale for any purpose other than resale in the regular course of business in the form of tangible personal property. . . ." (Rev. & Tax. Code, § 6007.)

" 'Retailer' includes: (a) Every seller who makes any retail sale or sales of tangible personal property. . . ." (Rev. & Tax. Code, § 6015.)

[3] "For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers at the rate of 2½ percent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail in this State on or after August 1, 1933, and to and including June 30, 1935, and at the rate of 3 percent thereafter, and at the rate of 2½ percent on and after July 1, 1943, and to and including June 30, 1949, and at the rate of 3 percent thereafter." (Rev. & Tax. Code, § 6051.)

[4] "There are exempted from the taxes imposed by this part the gross receipts from occasional sales of tangible personal property and the storage, use, or other consumption in this State of tangible personal property, the transfer of which to the purchaser is an occasional sale." (Rev. & Tax. Code, § 6367.)

[5] "Every individual, firm, copartnership, joint venture, trust, business trust, syndicate, association or corporation making more than two retail sales of tangible personal property during any 12-month period, including sales made in the capacity of assignee for the benefit of creditors, or receiver or trustee in bankruptcy, shall be considered a retailer within the provisions of this part in his or its individual, firm, copartnership, joint venture, trust, business trust, syndicate, associate or corporate capacity." (Rev. & Tax. Code, § 6019.)

732

subsequent to the transfer here involved and is therefore not considered.

Section 6006.5 defines an occasional sale as follows: " 'Occasional sale' includes: (a) A sale of property not held or used by a seller in the course of an activity for which he is required to hold a seller's permit, provided such sale is not one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit; (b) Any transfer of all or substantially all the property held or used by a person in the course of such an activity when after such transfer the real or ultimate ownership of such property is substantially similar to that which existed before such transfer. For the purposes of this section, stockholders, bondholders, partners, or other persons holding an interest in a corporation or other entity are regarded as having the 'real or ultimate ownership' of the property of such corporation or other entity."

The undisputed evidence shows that the sale was one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit and was therefore not an occasional sale under subdivision (a) of section 6006.5. Plaintiff's own evidence shows that in 19 separate sales, in addition to the sale in question, it sold at various times from 1947 through 1950, 65 items of equipment for a total of $41,879.22. Three sales took place within six months preceding the sale in question and two in the month following. The items sold from 1947 to 1950 included trucks, automobiles, generators, a compressor, a steam cleaner, cranes, trailers, tar pots, and a dynamometer. The items sold in the sale in question included trucks, an automobile, generators, compressors, steam cleaners, cranes and crane attachments, trailers, and tar pots.

Although they involved sales prior to the enactment of section 6006.5 the following cases are directly in point, for they involved essentially the same question that section 6006.5, subdivision (a), presents, namely, was the sale one of a series of sales sufficient in number, scope and character to constitute an activity requiring the seller to hold a seller's permit. In fact, the words of the statute "number, scope and character" were apparently taken from this court's opinion in *Northwestern Pacific R. R. Co.* v. *State Board of Equalization,* 21 Cal.2d 524, 529 [133 P.2d 400]. That case held that five sales of rolling stock over a three year period for about $100,000 could not be regarded as casual or isolated sales,

and that the seller was therefore a retailer and the tax applied. *Market Street Ry. Co.* v. *California State Board of Equalization,* 137 Cal.App.2d 87, 95 [290 P.2d 20], involved about 900 sales totaling about $100,000 during a 15-year period. Considering the "number, scope, and character of the transfers," the court held the seller to be a retailer. *Los Angeles City High School Dist.* v. *State Board of Equalization,* 71 Cal.App. 2d 486, 488, 489 [163 P.2d 45], held that sales of buildings, improvements, and equipment not needed by the school districts, averaging two to three sales per quarter over a three-year period were sufficient to make the sellers retailers and subject to the tax. Moreover, *Sutter Packing Co.* v. *State Board of Equalization,* 139 Cal.App.2d 889, 895-896 [294 P.2d 1083], involving a sale after the enactment of section 6006.5, held that a sale consummated on June 1, 1949, was one of a series and that the gross receipts therefrom must be included in the measure of the tax although they totaled $700,000 and the gross receipts from the largest sale since 1945 had totaled only $12,063.69. The court there stated: "There appears to be nothing, however, inherently different in the nature of the items sold in the final sales than in the earlier sales of used equipment, although it is true that it was a much larger sale of a greater variety of items."

It is immaterial whether or not the property transferred was used for field operations. Moreover, not only is there no evidence that the various sales to others were not sales of field equipment, but plaintiff's own exhibits disclose that the property transferred was the sort of property in which plaintiff dealt as a seller. Thus, plaintiff's list of items in the sale to Pacific Pipeline & Engineers, Ltd., includes 80 trucks, 1 automobile, 33 generators, 31 tar pots, 25 trailers, 3 cranes and 16 crane attachments, 3 steam cleaners, 20 compressors and 1 dynamometer and its list of retail sales to others includes 36 trucks, 13 automobiles, 4 generators, 2 tar pots, 3 trailers, 2 cranes, 1 steam cleaner, 1 compressor, and 1 dynamometer. Nor is it material that there were no similar sales between the two corporations, for in any series of sales by a retailer there is ordinarily a different purchaser in each sale, and the fact that the sales are not to the same purchaser serves to demonstrate "an activity requiring the holding of a seller's permit." Furthermore, the fact that three corporations were involved in the whole deal has no bearing on the question whether the sale was "one of a series," but is relevant only in determining

whether it was an occasional sale under subdivision (b) of section 6006.5.

■ Plaintiff has not met the burden of proof placed upon it by section 6091[6] of the Revenue and Taxation Code to show that the sale was an occasional sale under subdivision (b) of section 6006.5. The reorganization pursuant to which the sale took place was not a liquidation, but a territorial division of the "pipeline business" between two corporations. There is no finding and no evidence that the sale involved all or substantially all of the property held or used by the plaintiff. Plaintiff's allegations and proof and the court's findings indicate only that the transfer was an exchange of "certain properties" and "certain equipment" and the reorganization agreement expressly excludes an undisclosed amount of plaintiff's property from the transfer. Moreover, there is no finding and no evidence that the real or ultimate ownership of the property sold was substantially similar before and after the transfer. The evidence indicates the contrary.[7]

---

[6] "For the purpose of the proper administration of this part and to prevent evasion of the sales tax it shall be presumed that all gross receipts are subject to the tax until the contrary is established. The burden of proving that a sale of tangible personal property is not a sale at retail is upon the person who makes the sale unless he takes from the purchaser a certificate to the effect that the property is purchased for resale."

[7] The only testimony in the record on this issue was:

"Q. Now, do you know what the nature of this transaction was, Mr. McDuffie? Will you explain to the Court just what happened in the transfer of that particular property?

"MR. SUMNER: Now, just a moment. I think that I will object to that on the ground, No. 1, it is not the best evidence. I understand this transaction was the subject of a written contract.

"MR. WOLFE: I am going to introduce the contract, counsel. I am leading up as preliminary, and I will get into that.

"THE COURT: Well, if the witness knows, he may tell us as a starting point. We won't look to his testimony varying the terms of the contract. You may answer the question.

"THE WITNESS: What was the question again?

"THE COURT: Will you read the question again, Mr. Reporter. (Question read.)

"THE WITNESS: I do know the equipment was transferred. I know what equipment was involved, and I do know there was an agreement, I have seen that, but I do not know what is in the agreement.

"Q. BY MR. WOLFE: Well, do you know to whom the property was transferred? A. There were——

"Q. Do you know to whom it was transferred—the property? A. Well, yes. Pacific Pipeline Construction Company, Pacific Pipeline & Engineers, Ltd., and Engineers, Ltd., were the three corporations involved in the whole deal. It was transferred to the same people, they were all the same people.

"Q. In other words, this $201,000 was transferred to the—what was it, the Pacific Pipeline & Engineers, Ltd? A. That's right."

Thus, the reorganization agreement provided that the purchaser, Pacific Pipeline & Engineers, Ltd., was to be owned and operated jointly by Roy Price and Engineers, Ltd. Although G. W. Abernathy had a substantial interest in the seller, Pacific Pipeline Construction Company, both before and after the reorganization, he apparently had no interest in the purchaser, Pacific Pipeline & Engineers, Ltd., after the reorganization. In the present state of the record, therefore, it cannot reasonably be held that the real or ultimate ownership of the property after the transfer was "substantially similar to that which existed before such transfer."

Since neither subdivision (a) nor subdivision (b) of section 6006.5 applies to the sale in question, and since no other provision of law exempts it from the operation of section 6051, that section controls. It follows that the gross receipts from the sale were properly included in the measure of the tax.

Despite the undisputed evidence demonstrating that the sale in question was one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit, and despite the absence in the record of any evidence that the sale was a transfer of all or substantially all the property held or used by plaintiff in the course of such activity or of any evidence that after the transfer the real or ultimate ownership of the property

---

It cannot reasonably be inferred from the statement "It was transferred to the same people, they were all the same people" that the real or ultimate ownership of the property was substantially similar before and after the transfer. Immediately following this statement the witness made clear what he meant, namely that the property was transferred to Pacific Pipeline & Engineers, Ltd. Neither he nor any other witness was asked who ultimately owned the purchaser, Pacific Pipeline & Engineers, Ltd., and it is apparent that counsel was simply attempting to elicit that the property was sold to this purchaser and was not inquiring as to the ultimate ownership thereof.

Moreover, the transfer was made pursuant to an agreement (plaintiff's Exhibit No. 15), which provides for a change in the ultimate ownership of both transferor and transferee. The foregoing testimony was simply preliminary to the introduction of the agreement and the witness testified that he did not know what was in the agreement. The agreement shows plainly that the ultimate ownership was not substantially the same before and after the transfer and reorganization. It provides: "It is the fundamental intent of the parties hereto that Abernathy shall acquire assets substantially equal in value to the present value of his one half ownership of Pacific. . . ." Thus before the transfer and reorganization 50 per cent of the ultimate ownership of this equipment was held by Abernathy. After the transfer and reorganization, G. W. Abernathy had no interest in the property transferred, for the agreement provides that after the reorganization the northern business will be retained by Pacific Pipeline & Engineers, Limited and that "Roy Price and Engineers, Limited will jointly own and operate" the northern business.

was substantially similar to that which existed before the transfer, it is contended that the finding of the court that the sale was an occasional sale is binding on this court. The two inescapable answers to this contention are: (1) Even regarded as a finding of fact the court's finding is without any evidence to support it, and (2) the so-called finding, involving as it does, "the construction of a statute and its applicability to a given situation" is actually a conclusion of law (*Estate of Madison*, 26 Cal.2d 453, 456 [159 P.2d 630]) that is patently erroneous under the express language of the statute and previous controlling decisions.

The judgment is reversed.

Gibson, C. J., Carter, J., and Spence, J., concurred.

McComb, J., dissented.

SCHAUER, J., Dissenting.—The trial court, from a wealth of oral and documentary evidence showing the transactions involved and the relationships of the parties, both contractual and territorial, and including stock ownership, presumptively resolved all conflicts and drew all permissible inferences in favor of plaintiff. Among other things, it expressly found that "said transfer of property [on which the disputed tax is based], as provided for in . . . [the] exchange agreement, was not a sale of property at retail such as is contemplated by and referred to in Section 6051 of the Revenue and Taxation Code, but was an occasional sale within the meaning of that term as used in Sections 6367 and 6006.5 of the Revenue and Taxation Code, and as contemplated by the pertinent law of California." Certainly, a transfer of property was involved but equally certain is the fact that it was not any ordinary retail sale. Specifically, the trial court found that the subject agreement effected "a reorganization of the Pacific Pipeline and Engineers, Ltd., and of the plaintiff and for a territorial division of 'pipeline business' between said corporations" and that the transfer involved was made to carry out such agreement. Based on all the evidence before it, including the inferences it drew, and guided by the applicable statute, the trial court reached its above quoted conclusion of mixed law and fact; i.e., that the subject transfer "was not a sale of property at retail such as is contemplated by and referred to in Section 6051 . . . but was an occasional sale within the meaning of that term . . . as contemplated by

the pertinent law of California." Overturning that finding-conclusion necessarily involves a reweighing and *reweighting* of the evidence, and that is not properly within the function of this court.

It is the duty of this court not only to view the evidence favorable to sustaining the findings but likewise to liberally construe the findings in favor of the judgment. (*Richter* v. *Walker* (1951), 36 Cal.2d 634, 639 [1, 3, 4] [226 P.2d 593].) Furthermore, as stated in the Richter case at page 640 [5], "It is . . . to be noted that while full findings are required upon all material issues a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made."

It appears to me that the majority, rather than conforming to the rules above stated, have scrutinized and construed both evidence and findings to the end of reversal rather than affirmance. For example, the majority, without relating all of the evidence pertinent to the ultimate fact, state that "The undisputed evidence shows that the sale was one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit and was therefore not an occasional sale under subdivision (a) of section 6006.5. . . ." That declaration either ignores or gives no weight to the evidence establishing the isolated and distinct character of the subject transaction.

There is substantial evidence that this was "A sale of property not held or used by a seller in the course of an activity for which he is required to hold a seller's permit," and that "such sale is not one of a series of sales sufficient in number, scope and character to constitute an activity requiring the holding of a seller's permit" (Rev. & Tax. Code, § 6006.5, par. (a)). Plaintiff's manager and plant engineer testified as follows:

"Q. Mr. Porter, to your knowledge have there ever been any other transfers by Pacific Pipeline Construction Company as shown in Exhibit B to Exhibit 16, or as referred to in Exhibit 15? In other words, the two agreements [evidencing the subject transfer]? A. I take it that you mean transfers between the two companies that did exist at one time?

"Q. That is right. A. Not to my knowledge.

"Q. Or similar transactions between any individuals of the companies? A. No.

"Q. That was the only one instance in which you had such a transaction? A. To the best of my knowledge, that is true."

The foregoing testimony, although sufficient in itself to support the trial court's finding on the most critical issue, is only a part of the evidence tending to show that the subject transfer was an isolated and "occasional" transaction. The fact that the witness further testified that "There could be" sales of which he did not know, certainly does not make the quoted testimony incompetent; it goes merely to the weight to be accorded such testimony and, as I have emphasized, and the majority ignore, the weight of the evidence is for the trial court's resolution.

It is significant, as further supporting the trial court's finding that this sale was "occasional," that there is evidence, presumably believed by the trial court, that this was not a sale to an outside or retail customer. There is direct testimony that "Pacific Pipeline Construction Company, Pacific Pipeline & Engineers, Ltd., and Engineers, Ltd., were the three corporations involved in the whole deal. It was transferred to the same people, they were all the same people." Furthermore, the majority reweighs evidence that the property transferred was used for field operations and that it was not the sort of property in which plaintiff customarily dealt as a seller, and gives to such evidence as reweighed an effect unfavorable rather than favorable to upholding the findings and judgment.

The relationship among the three corporations (its evidential effect is also disregarded or reweighted by the majority) was described as follows by the witness Ramey, plaintiff's office manager: "Prior to 1946 in October, Pacific Pipeline Construction Company . . . was organized for the purpose of carrying on pipeline maintenance. In other words, what we did was anything pertaining to the pipeline in the field. In other words, the installation and maintenance of oil, gas, water type of pipelines. . . . That was its primary function. . . . In October, 1946, the Pacific Pipeline Construction Company formed a partnership with Engineers, Ltd., a corporation . . ., for the purposes of continuing this general field of pipeline work, and that became known as Pacific Pipeline & Engineers, Ltd. So Pacific Pipeline Construction Company ceased doing general field operations in its own name at that time. Engineers, Ltd., of course, had their own business doing construction work on dams and large buildings, but they went into a partnership under the name of Pacific Pipeline & Engi-

neers, Ltd., continuing the same work in the same field that had been done prior by the other corporation. In October, 1947, Pacific Pipeline & Engineers, Ltd., formed a corporation; in other words, they changed from a partnership setup to a corporate setup, continuing the same type of work.

"Approximately at that time . . . a coating and reconditioning plant was laid out . . . and that would have been under the setup of Pacific Pipeline & Engineers, Ltd., inasmuch as I repeated previously Pacific Pipeline Construction Company had ceased any field operations or any functional operations at that time. That operation was continued until March, 1949 [the time of the sale in controversy], at which time it was decided that the Pacific Pipeline & Engineers, Ltd., as it had conducted its business in Los Angeles and throughout the state, it was decided by the principals involved in these companies that there would be a reorganization; in other words, a change in the location of where they functioned in their work, and so up to that point that is where the change took place.

"Q. In other words, you are telling us then that at that time they broke up the former partnership which had become a corporation and went their separate ways? A. That is correct. . . .

"Q. And at that time there was a distribution of the assets of the corporation known as Pacific Pipeline & Engineers, Ltd. To the various principals that had formerly been partners, and to some of the individuals—— A. That is correct.

"Q. ——in the corporation? A. That is correct.

"Q. In other words, a sort of a reorganization? A. That is true."

The mentioned distribution from Pacific Pipeline & Engineers, Ltd., to plaintiff was in exchange for the subject transfer.

Accepting the view, implicit in the majority opinion, that the "finding" that this was an occasional sale involved also (as do findings in many cases, including those in ordinary personal injury litigation) a conclusion of mixed law and fact, it is obvious that the ultimate determination by the trial court as to whether this was an occasional sale involved consideration of all the evidence which was before that court, including necessarily that which has been summarized, and resolution of the conflicts, including the varying inferences which could be drawn from any part or the whole of it. Although on the

foregoing evidence reasonable minds could differ, it is manifest that the trial court's conclusion is supportable from the evidence and the facts found. Accordingly, if we follow the rules hereinabove stated, the judgment should be affirmed.

Shenk, J., and McComb, J., concurred.